(574 P.2d 960)
No. 48,959

In the Matter of the Estate of Florence M. Mellott, Deceased.
MARGARET MAY MACURDY and MARY NELL CORCORAN, *Appellants.*
ARTHUR M. MELLOTT, Executor, *Appellee.*

Petition for review denied January 25, 1978.

Opinion filed December 9, 1977.

*Reid F. Holbrook* of Steineger, Holbrook, Parks and Fritz, of Kansas City, for the appellants, Margaret May Macurdy and Mary Nell Corcoran.

*Newell A. George* and *John K. Dear*, of Kansas City, for the appellee, Arthur M. Mellott.

Before ABBOTT, P.J., SPENCER and PARKS, JJ.

SPENCER, J.: Florence M. Mellott died testate on July 13, 1969, a resident of Wyandotte County, Kansas. She was survived by her daughters, Margaret and Mary, and by her sons, Howard and Arthur. Her last will and testament dated July 27, 1958, was admitted to probate and her son Arthur was appointed and qualified as executor, without bond, on September 3, 1969. The admission of the will to probate is not in question.

Provision was made for the payment of debts and funeral expense, after which the testatrix made separate bequests to Margaret, Mary, and Howard in form as follows:

"I hereby bequeath to [name] . . . the following specific personal property, to wit: (here follow items of particular identifiable personal property) . . . two (2) shares of Brotherhood State Bank stock . . . ."

A fourth bequest in favor of Arthur is identical in form to the above except that, instead of a specific number of shares, he is to receive "the balance of the stock owned by me in the Brotherhood State Bank." The residuary estate was devised and bequeathed in equal shares to the four children of the testatrix. The executor was granted the power to sell and dispose of property at his discretion without court order.

On the date the will was signed, the testatrix owned seven and one-half shares of Brotherhood State Bank stock. At the time of her death, her holdings stood at 86 shares; and at the time of the final accounting at 172 shares. One of the findings of the trial court is as follows:

"The Court further finds that testatrix, at the time of the execution of her will, owned seven and one-half shares of Brotherhood State Bank stock and thereafter acquired the following:

August 29, 1958   purchased one-half (½) share

January 10, 1962   Eight for one (8 for 1) stock divided for total of sixty-four (64) shares.

January 17, 1968   Fifty percent (50%) stock dividend for total of ninety-six (96) shares.

February 19, 1968   Deceased purchased ten (10) shares for total of one hundred six (106) shares.

May 14, 1968   Deceased sold Arthur M. and Olivia R. Mellott twenty (20) shares giving said deceased total of eighty-six (86) shares.

January 20, 1971   One hundred percent (100%) stock dividend giving estate total of One hundred seventy two (172) shares."

On January 9, 1970, Arthur as executor filed an inventory and appraisal listing among the estate assets eighty-six (86) shares of Brotherhood State Bank stock and $1,400.19 in cash. These items were also listed as the personal property of the decedent on the form entitled "Information Concerning a Non-Taxable Estate" filed with the Kansas Director of Revenue.

The record reveals that the $1,400.19 in cash had been held by decedent in three separate bank accounts: $1,000 in a savings account and $327.34 in a checking account at the Wyandotte County Bank, and $72.85 in a checking account at the Commercial National Bank. Arthur later claimed the first two accounts as surviving joint owner. After Arthur qualified as executor, he transferred all of the funds to the Wyandotte County Bank checking account, which was thereafter referred to as the "estate account."

Prior to her death, the testatrix had borrowed $1,500 from the Wyandotte County Bank and had pledged her Brotherhood State Bank stock as collateral. The principal of that loan was subsequently reduced to $1,400. On December 3, 1969, following his appointment as executor, Arthur pledged the eighty-six shares of Brotherhood State Bank stock as collateral for a personal loan of $4,000 from the Home State Bank. The proceeds from that loan were then deposited in the "estate account," from which the decedent's debt of $1,400 plus interest of $56, as well as a $500 personal debt of Arthur's plus interest of $5, were paid. The remaining approximately $2,000 of the loan was transferred to the family-owned corporation, Mellott Timberlake, Inc. The executor did not seek court authority to pledge the stock for his loan, but the undisputed evidence at trial was that he had his brother's and sisters' prior permission to do so.

The "estate account" was merely a continuation of the checking account which the decedent had at the Wyandotte County Bank during her lifetime. The checks used were imprinted only with the name of Florence M. Mellott and were paid over the signature of Arthur M. Mellott without his designation as executor. He paid from this account, without the formality of claims

being filed, $150 to Howard Mellott, $250 to the Brotherhood State Bank, and $500 to Mellott Timberlake, Inc.

The executor filed his petition for final settlement together with a final accounting on November 6, 1972. "Bank accounts, joint with petitioner and savings accounts" in the amount of $1,400.19 were listed as estate assets. A payment to the "Wyandotte County Bank (note & interest)" of $1,961 was listed as a disbursement. The petition for final settlement proposed that all of the remaining estate be divided equally among the four children. The executor and his attorney waived fees for their services. Margaret and Mary filed written defenses, noting that the disbursement to the Wyandotte County Bank should have been for only $1,456. The executor admitted error and amended his accounting to reflect only that amount. At the same time the executor deleted from the amended account the sum of $1,327.34 which had been shown on the original accounting, but which the executor now claimed to be his personal property as the surviving joint owner of the two bank accounts standing in his name with the testatrix as joint tenants with right of survivorship. By his doing so, there remained only the sum of $72.85 as the beginning cash balance in the estate. In addition, the executor and his attorney now sought fees for their services and a petition for determination of intent was filed asking the court to determine the respective interests of the legatees in the Brotherhood State Bank stock in light of the substantial increase in the number of shares.

By its order filed April 5, 1973, the probate court directed distribution of the Brotherhood State Bank stock on the basis of two parts each to Margaret, Mary, and Howard, and one and one-half parts to Arthur. That court also found that the two bank accounts totaling $1,327.34 had been held in joint tenancy accounts by the testatrix with Arthur and passed to Arthur as the surviving joint owner upon the death of the testatrix. The court also approved the executor's amended accounting and directed that he receive a fee of $500 and the further sum of $1,000 to be paid to his attorney.

Not satisfied with the order directing distribution of the bank stock, the executor appealed to the district court, where the matter was heard *de novo*. Arthur there testified as to the joint tenancy nature of the Wyandotte County Bank accounts; that he left that money in the "estate account" because he needed money to pay

expenses; and that when there were estate receipts he simply deposited them to the "estate account."

As shown by the journal entry of judgment filed October 8, 1976, the district court found:

". . . [T]hat the Will of the deceased speaks from and took effect on the date of the death of said deceased on July 13, 1969. That the terms of the said Will are explicit and therefore not subject to judicial construction. That the funds [of the two accounts at the Wyandotte County Bank were joint tenancy accounts and] passed to said joint tenant on the date of death of deceased. That the executor Arthur M. Mellott did not commit any acts of misconduct or fraud in his handling of the subject estate and therefore is entitled to the fees awarded him in the Probate Court.

. . . . . . . . . . . . . . .

"That in accordance with the Last Will and Testament of deceased, the Brotherhood State Bank stock should be distributed as follows:

"Margaret M. Macurdy 4 shares
Mary N. Corcoran 4 shares
Howard A. Mellott 4 shares
Arthur M. Mellott balance of stocks."

Margaret and Mary have appealed, contending error by the trial court in (1) approving the final accounting, (2) approving the acts and conduct of the executor and allowing an executor's fee, (3) the disposition of the bank stock, and (4) denying them an allowance for attorney fees.

Considering first the matter of the accounting, it is well established that the burden of proving the correctness of the final accounting is upon the executor. *In re Estate of Hawk,* 171 Kan. 478, 233 P.2d 1061. Appellants have lodged several objections, the foremost of which is the exclusion of the joint tenancy accounts from the estate. Although the only evidence as to the joint tenancy nature of the accounts was the testimony of Arthur himself, that testimony was uncontradicted and, as such, was sufficient to form the basis for the finding by the trial court that the accounts were in fact held in joint tenancy.

It is argued that by reason of having listed the accounts as assets of the estate on the inventory and on the inheritance tax report Arthur has waived any right which he may have had to those accounts, is estopped from claiming title to the accounts, and is barred by the non-claim statute (K.S.A. 59-2239) from removing them from the estate. These arguments are answered in the case of *In re Morgan,* 219 Kan. 136, 546 P.2d 1394, where it is stated:

"The inventory is only *prima facie* evidence of the contents of an estate." (Syl. 1.)

"An executor who includes in his inventory property held by him in joint tenancy with the decedent does not by that act alone estop himself from claiming title to such property." (Syl. 2.)

Although the accounts were carried as "cash" on the inventory and the inheritance tax report, we note they were listed as "bank accounts, joint with petitioner" on the original of the final accountings. We also note the executor's original intention to divide all of the assets, apparently including the joint tenancy bank accounts, equally among all of the legatees of the testatrix and to waive any entitlement to fees. We recognize also what appears to be an attempt by a family member to administer and distribute the assets of a relatively small estate without undue complication and expense. Under the circumstances, and in view of the findings of the trial court which approved and allowed the acts and proceedings of the executor, we conclude that Arthur did not waive his entitlement as the surviving joint owner of the two bank accounts.

*Morgan* also stated that "[o]ne who asserts an estoppel must show some change in position in reliance on the adversary's misleading statement . . . ." (219 Kan. at 137.) Here, there is no evidence of any change of position by appellants in reliance on the fact that the joint accounts were reported as assets of the estate. They argue that although this was a non-taxable estate the manner of reporting the estate for tax purposes was such that might have caused them to share in any resulting tax burden. If such a situation had arisen, a case for estoppel *might* have been made, but as no taxes were assessed the point is not well taken.

Appellants argue that Arthur should have filed a claim against the estate within the time allowed by K.S.A. 59-2239. *Morgan* noted with approval the case of *Oswald v. Weigel,* 215 Kan. 928, 529 P.2d 117, to the effect that an executrix who incorrectly included her own personal property in the inventory of an estate need not take any action to remove the property from the estate as that property did not belong in the estate to begin with and the non-claim statute did not apply. (219 Kan. at 138.)

It is urged that the executor should be required to reimburse the estate for the $505 paid from the estate account in satisfaction of his personal obligation to the Wyandotte County Bank. As previously noted, this item was included in the payment of the

decedent's debt originally reported at $1,961, but corrected and reduced on the amended accounting to $1,456. It is obvious that payment of the personal debt of $505 was not from the estate funds, but rather from the personal funds of the executor which he had left in or deposited to the estate account. Three other disbursements from the estate account which were challenged by the appellants ($150 to Howard, $250 to the Brotherhood State Bank, and $500 to Mellott Timberlake, Inc.) may also be accounted for as having been taken from the executor's personal funds then remaining in the "estate account," for on the amended accounting those funds are not shown as receipts and the challenged expenditures are not shown as disbursements.

Without intending to condone the manner in which the executor maintained his records and accounts, we conclude that the trial court did not err in approving the amended final accounting.

It is argued that the executor should be liable for compound interest for commingling of funds. We are referred to the case of *Vincent v. Werner,* 140 Kan. 599, 38 P.2d 687, wherein it is stated:

"The theory argued by the executor and followed by the trial court is that the executor only had to be able to pay the amount of money that had come into his hands as trustee, on demand. This is not the rule. The law is extremely jealous of what is done with the beneficiaries' money by a trustee. He must keep it by itself. To approve the commingling of the beneficiaries' money with that of the trustee would subject the trustee to too great a temptation to use this money and cover up the fact with one subterfuge or another. As good a way as any to guard against this is to hold that the trustee is liable to the beneficiaries for compound interest on the money of the beneficiaries which the trustee thus commingles with his own." (140 Kan. at 605.)

In *Vincent,* our Supreme Court, in quoting from *Purdy v. Johnson,* 78 Cal. App. 310, 319, 248 Pac. 764 (1926), made note of the reason for this rule as follows:

"The rule is not adopted for the purpose of punishing the trustee for any intentional wrongdoing in the use of the trust funds, but rather to carry into effect the principle, enforced by courts of equity, that a trustee shall not be permitted to make any profit from the unauthorized use of such funds; it is intended to secure fidelity in the management of trust estates in order to fully realize any profit that the trustee may have made." (140 Kan. at 605.)

The circumstances in *Vincent* were that the executor deposited some of the money belonging to the estate in his personal bank accounts in various banks; he kept some of the money belonging to the estate in safety deposit boxes in the bank and in his own

safe in his office, having a sufficient amount of money at all times to cover all balances due the estate, but he commingled some of the money of the estate with his own. He was unable to give a clear account of how cash held in the safety deposit box had been accumulated or disbursed. The court assessed compound interest.

We take note here that without the joint tenancy bank account funds which the executor left in the estate account the cash balance of this estate at the outset was $72.85. By December 15, 1969, there was a deficit balance of approximately $1,835.50 and, in the final analysis, the disbursements on behalf of the estate exceeded receipts by the sum of $521.47. We note also that we do not have a situation of estate funds being carried in the personal account of the executor, but rather that personal funds of the executor were deposited to the estate account. Although the commingling of estate funds with those of the executor might normally require the assessment of interest regardless of wrongful intent, it has been held in accordance with the reason for the rule that the mere commingling without any use being made by the executor of the estate funds does not require the assessment of interest. 33 C.J.S., Executors and Administrators § 212, p. 1196. It is to be noted that in the absence of evidence to the contrary it will be presumed that the executor did make use of the funds for his own profit. *Estate of Harvey,* 224 Cal. App. 2d 555, 36 Cal. Rptr. 788 (1964). In this instance, however, the record establishes that estate funds were not used by the executor for his own profit. It is clear that the executor placed his personal funds in the "estate account" in order to pay obligations of the estate for which funds were not otherwise available. We conclude there is no basis on which to assess compound interest.

Argument is made that because of various alleged acts of misconduct the executor should be denied a fee for his services. The rules in this area were stated in *Bessman v. Bessman,* 214 Kan. 510, 520 P.2d 1210, as follows:

" . . . [A] court-appointed fiduciary may be deprived of compensation for the commingling of funds and inadequately accounting for them (*In re Estate of Jones,* 174 Kan. 506, 257 P.2d 116), or for appropriating money of the estate (*In re Simmons Estate,* 136 Kan. 789, 18 P.2d 117), or for self-dealing for his own profit (*Vincent v. Werner,* 140 Kan. 599, 38 P.2d 687) . . . .

"The rules enunciated in all the foregoing cases are recognized by the American Law Institute in its restatement of both the law of trusts and that of agency. In the former, Restatement (Second) of Trusts, § 243 states:

'If the trustee commits a breach of trust, the court may in its discretion deny him all compensation or allow him a reduced compensation or allow him full compensation.'

"The authors' explanatory comments indicate:

'. . . In the exercise of the court's discretion the following factors are considered: (1) whether the trustee acted in good faith or not; (2) whether the breach of trust was intentional or negligent or without fault; (3) whether the breach of trust related to the management of the whole trust or related only to a part of the trust property; (4) whether or not the breach of trust occasioned any loss and whether if there has been a loss it has been made good by the trustee; (5) whether the trustee's services were of value to the trust.'

'. . . If the trustee repudiates the trust or misappropriates the trust property or if he intentionally or negligently mismanages the whole trust, he will ordinarily be allowed no compensation.' (Ibid.)" (214 Kan. at 521.)

The acts of misconduct for which appellants would deny the executor a fee are the alleged inadequate accounting and commingling of funds which have been previously discussed. They also point to the pledge of the Brotherhood State Bank stock as collateral for the $4,000 personal loan. Without in any manner intending to indicate approval for his doing so, we again note that by uncontradicted testimony the pledge of that stock was with the prior knowledge and approval of the other interested parties; the proceeds were deposited to the "estate account"; and additional funds from some source were necessary to meet the obligations of the estate. We are unable to find in this record any ulterior motive on the part of the executor with respect to that loan, which has since been repaid by the executor thereby securing a release of the bank stock from the pledge.

A question is also raised with respect to a 1957 Jeep pickup truck valued in the estate at $50 which, at the time of trial, was in the possession of the executor's son. The trial court found this to be property still on hand in the estate and the original of the accountings indicates that it was a vehicle being used by the family corporation in accordance with arrangements made with the heirs. There does not appear to have been a conversion of this asset.

Appellants contend the executor is guilty of misconduct for delay in settling the estate. K.S.A. 59-1501 [Corrick] provided that the executor should have one year from his appointment to settle the estate. (The period is now nine months. K.S.A. 59-1501 [Weeks].) Since Arthur qualified as executor on September 3, 1969, and did not file his original petition for final settlement

until November 6, 1972, there can be no doubt that the time limitation was violated. Although the period for settlement may be extended by the court for cause shown, the record discloses neither request nor extension. However, it does not appear that appellants, or any other party, ever inquired of the executor regarding the closing of the estate or in any manner sought to compel settlement as they could have done under K.S.A. 59-1501. Although an executor may be denied a fee for failure to settle the estate within the statutory time (34 C.J.S., Executors and Administrators § 876, p. 1050), we conclude that such determination rests in the sound discretion of the trial judge (*Bessman v. Bessman,* supra). We find no abuse of that discretion here.

We come now to the distribution of the Brotherhood State Bank stock. All concerned are agreed that, on the date she executed her will, the testatrix owned but seven and one-half shares of that stock and, on the date of her death, she was possessed of eighty-six shares. During that time she had purchased ten and one-half shares and had sold twenty shares. All are also in agreement that the remainder were acquired by means of stock dividends which, for the purposes of this appeal, are to be treated as stock splits.

By definition, a share of stock is a unit of interest in a corporation. While stock ownership confers no immediate title to any of the property of the corporation, it entitles the shareholders to a proportionate part of the property or its proceeds when distributed according to law and equity. Each share represents a distinct and undivided *share or interest in the common property of the* corporation. 18 Am. Jur. 2d, Corporations § 209, p. 737; 18 C.J.S., Corporations § 194, pp. 619-620.

A stock split is merely a dividing up of the outstanding shares of the corporation into a greater number of units without disturbing the stockholder's original proportional participating interest in the corporation. It is essentially a change of form and not of substance. 19 Am. Jur. 2d, Corporations § 808, p. 285.

Similarly, a stock dividend represents corporate profits theretofore available for distribution as dividends which are permanently appropriated to fixed capital, the shareholders receiving merely symbols or evidences of such appropriation. The proportionate interest of the shareholder in the corporation remains the same. 19 Am. Jur. 2d, Corporations § 812, pp. 288-289.

Appellants contend that the four bequests of bank stock are

specific legacies which, unlike general and demonstrative legacies, carry with them any accretions to the date of death of the testatrix. The executor counters that the bequest to him is specific and the others are general legacies; that the will is clear and unambiguous, is not subject to judicial construction, speaks from the date of death, and therefore each of the others is to receive but two shares and he all of the remainder. He points out that the testatrix is presumed to have known the law and had eleven years between the writing of her will and the date of her death in which to change her will if such was her intention. The executor agrees that a specific legacy carries with it the dividends and additions created by a stock split.

In the case of *In re Estate of West,* 203 Kan. 404, 454 P.2d 462, legacies, general and specific, were defined as follows:

"A legacy is general when it does not direct the delivery of a particular thing but may be paid or satisfied out of the general assets." (Syl. 5.)

"A legacy is specific when the bequest is of some definite, specific thing, capable of being designated and identified." (Syl. 6.)

See also, *Salvation Army v. Estate of Pryor,* 1 Kan. App. 2d 592, 570 P.2d 1380.

In *West,* it was also stated:

"The cardinal rule for the construction of wills to which all other rules are subordinate is that the intention of the testator, as garnered from all parts of the will or from the will in its entirety, is to be given effect and that doubtful or inaccurate expressions shall not override the obvious intention of the testator." (Syl. 4.)

In *Myers v. Noble,* 141 Kan. 432, 41 P.2d 1021, the court quoted from 73 A.L.R. 1256, note 2, as follows:

"The expression of the ownership of property by such words as 'my,' 'in my possession,' 'owned by me,' 'standing in my name,' 'which I now hold,' is a well-defined indication that a bequest of that property is a specific legacy." (141 Kan. at 438.)

See also, *Tomb v. Bardo,* 153 Kan. 766, 114 P.2d 320. In 6 Page on Wills (Bowe-Parker Revision) § 48.6, pp. 24-25, it is said:

"  .  .  .  The will, taken as a whole, may show that the legacy is specific, although the language of the legacy, if read by itself, and not in connection with the rest of the will, would indicate a general legacy.

"If testator gives a specific number of shares of stock in a specified corporation to a beneficiary, and in a subsequent provision of the will refers to 'my property,' including such stock  .  .  .  or testator gives a number of shares of stock in the

same paragraph of his will with specific gifts of personal property . . . such gifts would be specific . . . ."

In this case, each of the four bequests was of stock of the Brotherhood State Bank; each was of some definite, specific thing capable of being designated and identified; and each was contained in the same paragraph with items of particular identifiable personal property. We hold that all of the bequests were specific, that to Arthur also being such that it would fluctuate, increasing or diminishing, in accordance with the ownership of that stock by the testatrix. (6 Page on Wills [Bowe-Parker Revision] § 48.4.)

We recognize that each case must be viewed on its own merits and that the appellate court must attempt to give effect to the testator's intent as it perceives it. *In re Estate of Lehner,* 219 Kan. 100, 103, 547 P.2d 365. We recognize also the fundamental rule of Kansas law that a will speaks from the date of the testator's death in the absence of a contrary intent. *Baker University v. K.S.C. of Pittsburg,* 222 Kan. 245, 253, 564 P.2d 472. But the intent of the testator to which supreme importance must be attached must be ascertained from an examination of the entire instrument and, in this instance, must be as of the date the will was published. *Berry v. Berry,* 168 Kan. 253, 212 P.2d 283. We believe it is clear that, in making the specific bequest of two shares of Brotherhood State Bank stock to each of three of her children, the testatrix thereby intended that each should have that proportionate interest in the Brotherhood State Bank which two shares of stock then represented. It is only by allocating to each the additional stock occasioned by the stock splits that this may be accomplished. Neither the briefs of the parties nor our research has provided any direct Kansas authority on the specific issue here presented, but we are convinced that, as counsel for each of the parties has indicated, a specific bequest of corporate stock will carry with it the additions created by a stock split unless a contrary intention is clearly shown. Again, we make note that by agreement of the parties we are dealing with what in effect are "stock splits." As such, our disposition is in accordance with the general rule. See Annotation, 46 A.L.R.3d 7. Although there is divided authority as to the treatment of additional shares received as "stock dividends," we are not required to resolve that issue at this time.

We hold that the trial court was in error in its direction as to the distribution of the Brotherhood State Bank stock and that it should be distributed as follows:

To Margaret, Mary, and Howard, the two shares of Brotherhood State Bank stock initially bequeathed to each of them, increased to twenty-four shares by reason of the stock splits on January 10, 1962, and January 17, 1968, and increased to forty-eight shares by reason of the stock split on January 20, 1971, following the death of the decedent;

To Arthur, the remaining one and one-half shares of Brotherhood State Bank stock of which the testatrix was possessed on the date of her will, increased to two shares by the purchase of one-half share on August 29, 1958, increased to twenty-four shares by the stock splits on January 10, 1962, and January 17, 1968, increased to thirty-four shares by the purchase of ten shares on February 19, 1968, reduced by the sale of twenty shares on May 14, 1968, to a total of fourteen shares on the date of decedent's death, and thereafter increased to twenty-eight shares by the stock split on January 20, 1971. This is by reason of the fluctuating nature of the specific bequest to Arthur.

In a meritorious action brought to construe a will, attorney fees are allowable under the provisions of K.S.A. 59-1504 as costs of litigation where the services of the attorney have been beneficial to the estate or are necessary for proper consideration of the will. *Jennings v. Murdock*, 220 Kan. 182, Syl. 17, 553 P.2d 846. Appellants should be allowed their attorney fees in such amount as the court may find reasonable.

The judgment entered by the trial court is reversed and this cause is remanded with instructions to enter judgment to conform with this opinion.